IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD

RANDY MICHAEL BRODNIK, D.O.,

    Plaintiff,

v.                          Civil Action No. 1:11-0178

ROBERT LANHAM, et al.,

    Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending before the court are the parties' cross motions for summary judgment as to Count I of plaintiff's Second Amended Complaint. (ECF Nos. 101 and 105). For the reasons discussed below, defendant's motion (ECF No. 105)[1] is **GRANTED** and plaintiff's motion (ECF No. 101) is **DENIED**.[2]

**I. Background**

According to the Second Amended Complaint, at the time of the events giving rise to the instant Complaint, defendant Robert Lanham was employed as a special agent with the Internal Revenue Service. Complaint ¶¶ 8 and 10. As a result of a six-year investigation of plaintiff Randy Michael Brodnik, D.O.

---

[1] Plaintiff argues that defendant's motion should be denied because it was not timely filed. Given the confusion surrounding the deadline, the court finds that good cause exists for filing the motion out of time.

[2] Plaintiff actually filed a Motion For Court to Make Finding As to Whether or Not Defendant Deborah Beck is a State Actor for Purposes of <u>Bivens</u> Liability which the court has construed as a motion for partial summary judgment in plaintiff's favor.

("Brodnik") for income tax evasion, Lanham recommended that
Brodnik be prosecuted. See id. at ¶ 10. On March 18, 2009, a
federal grand jury returned a seven-count indictment against
Brodnik charging him with conspiracy and six counts of income tax
evasion. See id. at ¶ 11. On June 2, 2010, the grand jury
returned a seven-count second superseding indictment charging
Brodnik with one count of conspiracy, five counts of income tax
evasion, and one count of corruptly endeavoring to impede and
obstruct the due administration of the Internal Revenue laws.
See id. at ¶ 13. After a three-week jury trial, Brodnik was
acquitted of all charges. See id. at ¶¶ 14, 20.

Brodnik alleges that one of the government's witnesses,
defendant Deborah Beck, testified at Brodnik's trial that she
illegally accessed Brodnik's electronic mail and provided it to
defendant Lanham. See id. at 17-18. Count I of the Complaint is
brought pursuant to Bivens v. Six Unknown Named Agents of the
Federal Bureau of Narcotics, 403 U.S. 388 (1971), and alleges the
violation of Brodnik's constitutional rights.

Lanham filed a motion to dismiss the Bivens claim which
the court denied insofar as it alleged a violation of Brodnik's
Fourth Amendment rights regarding his email.[3] In his complaint,
Brodnik alleged as follows:

_____

[3] Lanham's motion to dismiss the Bivens claim was granted in
all other respects. See ECF No. 83.

17.     Defendant Beck testified that she illegally
        accessed plaintiff Brodnik's electronic email.

18.     Defendant Beck testified that she produced print
        outs of messages she obtained when she illegally
        accessed plaintiff Brodnik's electronic mail to
        defendant Lanham.

19.     Defendants Lanham and Beck conversed frequently
        via electronic mail and other means.  Some of
        defendants' conversations included defendant
        Beck's compensation if plaintiff Brodnik was
        convicted.

32.     Defendant Lanham participated in defendant Beck's
        actions by using the illegally accessed electronic
        mail in the prosecution of plaintiff Brodnik in
        violation of the Fourth and Fourteenth Amendments.

35.     Furthermore, defendant Lanham also discussed
        possible compensation for defendant Beck if
        plaintiff was convicted, thus encouraging
        defendant Beck to gain information in any manner
        possible in violation of the Fourteenth Amendment.

36.     By encouraging defendant Beck to illegally search
        and seize plaintiff's electronic mail, and then
        subsequently using the fruit of that illegal
        search and seizure, plaintiff's Fourth Amendment
        rights were violated.

Second Amended Complaint ¶¶ 17-19, 32, and 35-36.  Taking

plaintiff's allegations as true and drawing all reasonable

inferences in plaintiff's favor, the court found that a fair

reading of plaintiff's complaint is that Beck's acquisition of

Brodnik's emails was done at the behest and with the

encouragement of defendant Lanham, thereby transforming her

action into government action.  Specifically, the court stated:

        According to the complaint, in seizing the
        emails, Beck was encouraged to do so by Lanham
        and, therefore, could be considered an agent of

the government.  The viability of Brodnik's <u>Bivens</u>
claim hinges on whether Beck was acting as an
agent of the government when she seized
plaintiff's emails. If she was, the Fourth
Amendment is implicated.  If she was not, there is
no Fourth Amendment violation and plaintiff's
<u>Bivens</u> claim is subject to dismissal.

   For this reason, the court deems it necessary
to allow limited discovery on this issue so that
the court can determine whether to allow
plaintiff's <u>Bivens</u> claim to proceed.  <u>See</u>
<u>Crawford-El v. Britton</u>, 523 U.S. 574, 600 (1998)
("[T]he judge should give priority to discovery
concerning issues that bear upon the qualified
immunity defense, such as the actions that the
official actually took, since that defense should
be resolved as early as possible.").  Where, as
here, a court finds that a "plaintiff has made
sufficiently specific factual allegations" and
"taking plaintiff's allegations as true, plaintiff
has stated a violation of clearly established
law[,] . . . "[a]llowing limited discovery enables
the Court to resolve the issue of qualified
immunity in the manner envisioned by <u>Crawford-
El</u>."). <u>Delph v. Trent</u>, 86 F. Supp.2d 572, 577
(E.D. Va. 2000).

ECF No. 83.

   The parties engaged in limited discovery on the email

issue and the instant motions followed.

## II.  Analysis

   With respect to plaintiff's claims regarding Lanham's

methods in obtaining his emails, Lanham argues that his actions

are entitled to qualified immunity.  The defense of qualified

immunity shields a government official from liability for civil

monetary damages if the officer's conduct does not violate

clearly established statutory or constitutional rights of which a

reasonable person would have known.  <u>Wiley v. Doory</u>, 14 F.3d 993, 995 (4th Cir. 1994); <u>Smook v. Hall</u>, 460 F.3d 768, 777 (6th Cir. 2006).  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).

In <u>Saucier v. Katz</u>, 533 U.S. 194, 195 (2002), the Supreme Court mandated a two-step sequence for resolving the qualified immunity claims of government officials.

> First, a court must decide whether the facts that
> a plaintiff has alleged (see Fed. Rules Civ. Proc.
> 12(b)(6), (c)) or shown (see Rules 50, 56) make
> out a violation of a constitutional right.  533
> U.S., at 201, 121 S. Ct. 2151.  Second, if the
> plaintiff has satisfied this first step, the court
> must decide whether the right at issue was
> "clearly established" at the time of defendant's
> alleged misconduct.  <u>Ibid.</u>  Qualified immunity is
> applicable unless the official's conduct violated
> a clearly established constitutional right.

<u>Pearson v. Callahan</u>, 129 S. Ct. 808, 815-16 (2009).  The Court has held that courts may exercise discretion in deciding which of the two <u>Saucier</u> prongs "should be addressed first in light of the circumstances in the particular case at hand."  <u>See</u> <u>id.</u> at 818. "[T]he rigid <u>Saucier</u> procedure comes with a price.  The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no outcome on the case.  There are cases in which it is plain that a constitutional

right is not clearly established but far from obvious whether in fact there is such a right." Id.

Under the first prong, a court must determine whether the facts as alleged, taken in the light most favorable to plaintiff, demonstrate the violation of a constitutional right. Saucier, 533 U.S. at 201 ("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [state actor's] conduct violated a constitutional right?"). If the allegations do not give rise to a constitutional violation, no further inquiry is necessary. Id.

A right is clearly established when it has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state in which the action arose. Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). The relevant, dispositive inquiry is whether it would be clear to a reasonable person that the conduct was unlawful in the situation he confronted. Saucier v. Katz, 533 U.S. 194, 195 (2002). "Clearly established" does not mean that "the very action in question has previously been held unlawful," but requires the unlawfulness of the conduct to be apparent "in light of preexisting law." Wilson v. Layne, 526 U.S. 603, 615 (1999).

> The responsibility imposed on public officials to
> comply with constitutional requirements is
> commensurate with the legal knowledge of an
> objectively reasonable official in similar

> circumstances at the time of the challenged
> conduct.  It is not measured by the collective
> hindsight of skilled lawyers and learned judges. .
> . .  "Officials are not liable for bad guesses in
> gray areas; they are liable for transgressing
> bright lines."  Maciarello v. Sumner, 973 F.2d
> 295, 295 (4th Cir. 1992), cert. denied, 506 U.S.
> 1080 (1993).

Jackson v. Long, 102 F.3d 722, 730-31 (4th Cir. 1996); see also

Williams v. Hansen, 326 F.3d 569, 578-79 (4th Cir. 2003) (holding

that for purposes of qualified immunity, executive actors are not

required to predict how the courts will resolve legal issues).

"In determining whether the specific right allegedly violated was

`clearly established,' the proper focus is not upon the right at

its most general or abstract level, but at the level of its

application to the specific conduct being challenged.'"  Wiley v.

Doory, 14 F.3d 993, 995 (4th Cir. 1994)(quoting Pritchett v.

Alford, 973 F.2d 307, 312 (4th Cir. 1992)).

     Plaintiff's Bivens claim is that defendants Lanham and

Beck violated his Fourth Amendment right to be protected from

unreasonable searches and seizures by "illegally" accessing his

email.  The Fourth Amendment guarantees that, "The right of the

people to be secure in their persons, houses, paper, and effects,

against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the

place to be searched, and the persons or things to be seized."

U.S. Const. amend. IV; Minnesota v. Carter, 525 U.S. 83, 88

7

(1998).  To establish a violation of his rights under the Fourth

Amendment, Simons must first prove that he had a legitimate

expectation of privacy in the place searched or the item seized.

See Rakas v. Illinois, 439 U.S. 128, 143 (1978); United States v.

Rusher, 966 F.2d 868, 873-74 (4th Cir. 1992).

　　　In order to prove a legitimate expectation of privacy,

Brodnik must show that his subjective expectation of privacy is

one that society is prepared to accept as objectively reasonable.

See California v. Greenwood, 486 U.S. 35, 39 (1988).  A

government action constitutes a "search" only if it infringes on

an expectation of privacy that society considers reasonable.

United States v. Jacobsen, 466 U.S. 109, 113 (1984).  "Thus, the

government must obtain a warrant before inspecting places where

the public traditionally expects privacy, like the inside of a

home or the contents of a letter."  In re § 2703(d) Order, 787 F.

Supp.2d 430, 439 (E.D. Va. 2011)); see also United States v.

Karo, 468 U.S. 705, 714 (1984) (warrant required to use

electronic location-monitoring device in a private home); Kyllo

v. United States, 533 U.S. 27, 34 (2001) (warrant required to use

publically unavailable, sense-enhancing technology to gather

information about the interior of a home); Jacobsen, 466 U.S. at

114 (warrant required to inspect the contents of sealed letters

and packages); United States v. Warshak, 631 F.3d 266, 287–89

(6th Cir. 2010) (extending Fourth Amendment protection to the contents of email communications).

The court has already held that Brodnik had a legitimate expectation in the privacy of his emails. Furthermore, it was clearly established that as of the time Lanham began his investigation, on or about 2002 or later, that he needed a warrant to obtain Brodnik's emails. As the court previously found, the viability of Brodnik's <u>Bivens</u> claim turns on whether Beck was a state actor when she accessed Brodnik's emails. The court finds she was not.

Lanham testified that the first time he met Beck was on March 20, 2002. Deposition of Robert Lanham, February 2, 2017, at 116 (ECF No. 103-1) (hereinafter "Lanham Depo. at ___").[4] Beck testified that she had accessed Brodnik's email on two occasions after her employment ended -- once in Lanham's presence and on an earlier occasion outside his presence. Deposition of Deborah Beck, February 2, 2017, at 6-7, 11 (ECF No. 103-2) (hereinafter "Beck Depo. at ___"). The evidence is undisputed that Lanham did not know Beck had accessed Brodnik's email until he asked her where she had gotten a certain document (the will) and Beck told him. Lanham testified repeatedly and unequivocally

---

[4] Brodnik has objected to defendant's filing of the deposition transcripts in their entirety. However, more often than not, the court directs the parties to file the full deposition transcripts and would have done so in this case.

that he did not tell Beck to access Brodnik's email nor did he encourage her to do so. Lanham further testified that when he found out that she had accessed Brodnik's email, he told Beck not to do it again. Specifically, he testifed:

> Q:     Did you ever access Brodnik's e-mail account
>        without his retort?
>
> A:     Absolutely not.
>
> Q:     Did you ever tell Deborah Beck that she
>        should access Doctor Brodnik's e-mail
>        account?
>
> A:     That she should or shouldn't?
>
> Q      That she should.
>
> A:     No.
>
> Q:     Okay.  In fact, you directed her not to
>        access Brodnik's e-mail account.
>
> A:     Yes.
>
> Q:     And you did that at your first meeting on
>        March 20, 2002, correct?
>
> A:     Yes.
>
> Q:     And then you followed up and again
>        admonished her not to access his e-mail
>        account in June of 2002, correct?
>
> A:     I did.
>
> Q:     Are you aware whether or not Ms. Beck –
>        when you met with her in March of 2002,
>        were you aware at that moment, during that
>        meeting, whether or not Ms. Beck had in fact accessed Doctor
>
> A:     No.
>
> Q:     Okay.  Was that a general statement you
>        would make to a witness?

A:      Any time that I had a witness who had
        access to records in an office or
        something like that, if they no longer
        worked there, if there was some indication
        that maybe they were gonna try to get
        something and it was not legal, I would
        advise them, and that's what I did with
        her about the e-mail when I realized what
        she had done.

Q:      And when did you realize what she had
        done?

A:      After she had logged in, pulled up the
        document we were looking at and I asked
        her, you know, "What is this?  Where did
        it come from?"

Lanham Depo. at 118-19.

    Upon repeated questioning, Lanham continued to maintain

that Beck accessed Brodnik's email without his knowledge or

assent.

A:      [T]here was a time when Ms. Beck showed me
        – and I don't remember which meeting it
        was –

Q:      All right.  Showed you what?

A:      – a will – or maybe it was two wills.  It
        was a document that Anthony Kritt had
        prepared.  And I noticed that the document
        was prepared after [Beck] had left the
        employ of Doctor Brodnik and it – you
        know, it struck me.

        And I said, "How did you get this?"  And I
        can't recall – I can't recall if it was that
        first meeting or the second meeting.

Q:      Okay.  Do you remember anything else?

A:      She went to her computer and did
        something, which I now know she was

logging into, apparently, Doctor Brodnik's email account.

Q:     You say you now know.  You knew at the time of the trial, the criminal trial, didn't you?

A:     Yes.

Q:     You were asked about that.

A:     I did not know when she did this what she was doing.  I asked her where the document came from, and she went to her computer.

       I did not know what she was doing.  I didn't know if it was a file on her computer.  I did not know until I asked her, "What is this?  Where did this come from?"

Q:     And this is at one of the meetings that you had with her.  And what do you remember, if anything, she said?

A:     Like I said, she went to the computer, she pulled up this document, and I asked her something like, "What is this?  Where did it come from?"  And she said it was Doctor Brodnik's e-mail account.

Q:     All right.  And that was either the March 2002 or the June 2002 – or I think you may have said July 2002 meeting with Ms. Beck.  Right?

A:     Yeah.  I'm not sure when the two meetings took place.  I'm pretty sure the first one was in March.

Q:     All right.  And so do you remember anything else?

A:     The thing about the – her getting into the e-mail was probably in the first meeting.

                    *  *  *

Q:     Have we covered it?

A:        Everything I remember about?

Q:        Your meeting with Ms. Beck.  If you want
          to say on both occasions or one occasion
          or differentiate between the two, that's
          fine.

A:        . . .   I'm not sure but I believe that
          she gave me records at that meeting, but I
          can't specifically identify what they
          were.  I just – it was either that meeting
          or the second meeting, she gave me like a
          – like a shopping bag of records.

          I advised her after she accessed the e-mail
          account and told me that's what it was that
          she could not do that anymore, not to do it
          anymore.

Lanham Depo. at 23-25.

     Lanham's testimony did not waver on this point:  Lanham

maintained that he told Beck <u>not</u> to access Brodnik's email.

Q:        All right.  Do you recall when you first
          determined that Ms. Beck had accessed
          Doctor Brodnik's e-mail if you told her
          not to do it anymore?

A:        I absolutely did.

Q:        Why?

A:        Because of everything you just said.  I am
          not allowed to access someone's e-mail
          account without their permission unless I
          have some authority to do it.  And I did
          not have any authority to do so.

Q:        Yeah, we just have to put this on the
          record.  We're both on the same page here.
          But I wanted to make certain, you know,
          you understood that.  So there isn't any
          question about that.  If Doctor – if the
          government wanted to access Doctor
          Brodnik's e-mail, it would have had to

have gone before a judge or used some
                    judicial method - warrant or Grand Jury
                    subpoena - to attempt to get that
                    information.  Right?

          A:        Yes.

          Q:        Okay.  And you believe that Ms. Beck,
                    through Doctor Brodnik's e-mail, acquired
                    information about Doctor Brodnik's will?

          A:        I think that's what it was.

Lanham Depo. at 34-35.

          Lanham's testimony is internally consistent on this issue

and there was no ambiguity.  Once he found out that Beck had

accessed Brodnik's email, he told her not to do it again.

          Q:        All right.  Her accessing Doctor Brodnik's e-mail
                    account was a big no-no, wasn't it?

          A:        For me, yes.

          Q:        Yes.  And so it was of such a significant
                    issue, why didn't you make note of it in
                    your handwritten notes?

          A:        Because that is one of the few things that
                    I remember to this day about that meeting.

                              * * *

          Q:        I see on the Deposition Exhibit 3, you say
                    to her not to log on to Brodnik's e-mail
                    account and view his mail anymore, right?

          A:        Yes.

Lanham Depo. at 62-63.

          Q:        And you - Ms. Beck is telling you about
                    changes to Doctor Brodnik's will, correct?

          A:        Yes.

                                14

```
Q:      And then there's also a reference where it
        says, "Beck obtained this information from
        Brodnik's e-mail."  Right?

A:      Yes.

Q:      And then you say, "I reminded Beck she was
        not supposed to be looking at his e-mail
        anymore."  Right?

A:      Yes.
```

Lanham Depo. at 84.

Furthermore, Lanham's testimony was also clear that he
had no reason to believe that Beck accessed Brodnik's email after
he told her not to do so.

```
Q:      Did you receive any indication in writing after
        June of 2012 that Ms. Beck was accessing Doctor
        Brodnik's e-mails again?

A:      I didn't receive it in writing, and I
        didn't receive anything from anyone
        indicating that she was doing that.
```

Lanham Depo. at 88-89.

```
Q:      And there's no way really to know if after
        – except for looking at the documents and
        trying to make that educated guess, after
        June of 2002, any of the other things she
        sent you came from the e-mails.  There's
        no way to determine that, right?

A:      If I had suspected that that had happened,
        just like I did with the wills – which
        were of no use – I would have instructed
        her and told her, "We told you not to do
        that any more," and I would have went to
        the AUSA and said, "Look, we've got a
        problem here."

Q:      Did you do that?

A:      No, because it never happened.
```

Q:      You don't know that she didn't access it
        again.

A:      Okay, you asked me did I go to the AUSA
        and say that she had accessed his e-mail.

Q:      Yes.

A:      And I said it never happened, I never did
        that because I am unaware of her accessing
        his e-mail account after that one time.

Lanham Depo. at 94-95.

Q:      And how do you know that she had accessed
        the e-mail account by looking at
        Deposition Exhibit 3?

A:      Because that's where I wrote in there that
        I'd served her with a subpoena and I told
        her not to take any documents out of the
        office, and I explained to her it would
        cause problems, and I told her not to
        access the e-mail account anymore.

Q:      And do you know how it was that you
        determined that she had logged into
        Brodnik's e-mail account?

A:      I asked her.

Q:      Okay.

A:      Otherwise I wouldn't have known.

Q:      Okay.  Did she show you any e-mails at
        that time? At this March 20th, two
        thousand interview.

A:      I don't think she did, because she – I
        asked her about the document and she
        brought the document up, and once she
        brought the document up and I asked where
        it came from, then everything else was off
        limits.  We couldn't go any father.

        Told her to log out of it and not to do it
        anymore.

16

Lanham Depo. at 122-23.

> Q:    Okay. Are you aware of whether Ms. Beck
>        accessed Brodnik's e-mail account more
>        than once?
>
> A:    No. The one time that, you know, I
>        cautioned her not to do it anymore was the
>        only time that – well, it was the last
>        time. I think she had done it before, but
>        I didn't know anything about any of it
>        until the time she did it in my presence.
>
> Q:    Okay. And in fact, you told her not to do
>        that.
>
> A:    Yes. At that point, when I became aware
>        of it.

Lanham Depo. at 126-27.

Beck testified in a similar vein – that Lanham never told her to access Brodnik's email and that, when he found out she had, he admonished her not to do so again.

> Q:    Tell me how many times you – after your
>        employment ended with Doctor Brodnik or
>        Bluefield Women's Center how many times
>        you accessed his e-mail account.
>
> A:    Actually, it may have been two. I was
>        thinking one. But the reason I say two is
>        because the only reason I accessed it was
>        to see if I still had access before Mr.
>        Lanham came with the subpoena.

Beck Depo. at 6-7.

> Q:    Okay. When you accessed Doctor Brodnik's
>        e-mail, whichever time it was –
>
> A:    Uh-huh.
>
> Q:    – you say, Mr. Lanham was there, right?

A:     The one time.  The first time that I did
       it was – I was just trying to see if this
       was information – as a perfectionist, I'm
       not gonna give you bad information –

Q:     My question was: Mr. Lanham was there?

A:     The second time.

Q:     The second time Mr. Lanham was there.

A:     Yeah, because I handed it to him.

Q:     Right.

A:     I said, "I can't believe he's using my
       password."

Q:     Right.  And then what did Mr. Lanham say?

A:     He told me not to do it anymore, and he
       asked me, had I done it previously, and I
       said, "Yes, when I checked to see if this
       worked yesterday" – I think it was like
       yesterday.

                    * * *

Q:     And he was standing there while you were
       accessing it.

A:     Yes, but I didn't tell him what I was
       doing.  But I did go and key it in.

Beck Depo. at 32-34.

       Upon repeated questioning, Beck's testimony likewise

remained consistent on this issue:

Q:     And before you testified that you accessed
       the e-mail account –

A:     Uh-huh.

Q:     – this network account –

A:     Uh-huh.

                      18

Q:     – using your e-mail and your log-in and password –

A:     Uh-huh.

Q:     – because you had been served with a subpoena –

A:     Yes.

Q:     – and it was your understanding that some of the documents that were irrelevant were in this – on this network.

A:     Could – you know, my understanding – my point was that this might be something that I had, this was information I had. And if it was something that was supposed to be in part of the subpoena, then that was the way I looked at it, you know.

Q:     Okay.

A:     So yeah.

Q:     But Agent Lanham never told you to access –

A:     No, no ma'am.

Q:     – this network.

A:     Actually, he said, "Have you done this before?"  And I said, "No."  And I had not, except for just that night before. And then he said, "Well, don't do it again."

Q:     Okay.

A:     And I think he told me then, you know, that – not to – he told me not to do it. He said, "Don't do this again."  He said, "Don't ever get into this again."  And I didn't.

Q:     Okay.  And you mentioned before, as you were testifying to Mr. Harris' questions,

```
                    that at some point in time, you were
                    having a conversation – whether it was in
                    the kitchen or at some point, somewhere in
                    your house –

          A:        Uh-huh.

          Q:        – and then you walked over to the den and
                    accessed –

          A:        Yes, yes.

          Q:        – your computer.

          A:        Yes.

          Q:        And you went into the network account.

          A:        Yes.

          Q:        How did Agent Lanham react when you told
                    him that you had gone into this – into the
                    network?

          A:        Well, he was visibly upset.  I mean, he
                    said – that's what he asked me, he said,
                    "Have you done this before?"  That was his
                    first – and I said, "No."  And that's when
                    he said, "Well, don't do it again," you
                    know.  And so I didn't.  Yeah.

          Q:        I mean, he made it clear to you not to do
                    this again.

          A:        Yes, he made it very clear, yes, yes.
```

Beck Depo. at 57-59.  In her deposition, Beck maintained that her

decision to access the email was her belief, albeit mistaken,

that it was covered by the subpoena.[5]

---

[5] In her response to plaintiff's interrogatories, Beck
stated: "Deborah Beck acted at the direction of Robert Lanham who
presented himself and his credentials to her.  She believed that
he had apparent authority to direct her to act both in interview
and to access an email account which she established and had the

```
Q:      And – but it's your testimony here today
        that at no point in time did Agent Lanham
        ever tell you to access –

A:      No.

Q:      – this e-mail.

A:      No, no, no, no, no.  No, he didn't even
        know about it until, like I said, I think
        I went in there and was getting my stuff
        together and I said, "Oh, by the way," I
        think – I said, "Oh, by the way, there's
        an e-mail address," and I typed that in
        very quickly while I was talking.

        But he did – he told me, "Have you done this
        before?  Don't do it again."  And I didn't.
```

Beck Depo. at 64.

"We start with the presumption that conduct by private actors is not state action." <u>Florer v. Congregation Pidyon Shevuyim, N.A.</u>, 639 F.3d 916, 922 (9th Cir. 2011). "[Plaintiff] bears the burden of establishing that Defendants were state actors." <u>Id.</u>; <u>see also</u> <u>United States v. Aldridge</u>, 642 F.3d 537, 541 (7th Cir. 2011) ("The defendant bears the burden of proving agency, based on all the circumstances."); <u>United States v. Ellyson</u>, 326 F.3d 522, 527 (4th Cir. 2003) ("The burden of proving that a private party acted as an agent or instrument of the government is on the defendant."); <u>Mertens v. Shensky</u>, No.

---

password to access and which account she had used while within her employment with the plaintiff." (ECF No. 102-1). During her deposition, Beck explained that, in answering the interrogatory as she did, she thought that the search of the email was covered by the subpoena and not because Lanham had directed her to access the email. Beck Depo. at 62-65.

CV05-147-N-EJL, 2006 WL 173651, *3 (D. Idaho Jan. 23, 2006) ("The plaintiff bears the burden of showing that a private person is a state actor for the purposes of § 1983 [or Bivens].").  "Whether an agency relationship exists is a fact-intensive inquiry that is guided by common law agency principles."  Ellyson, 326 F.3d at 527.

In this case, there is no Fourth Amendment violation because Beck, a private citizen, accessed Brodnik's email of her own volition.  There is simply no evidence that Lanham encouraged Beck to do so or that he knew what she was doing until after the fact.  The Fourth Amendment does not apply "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official."  United States v. Jacobsen, 466 U.S. 109, 114 (1984) (quoting Walter v. United States, 447 U.S. 649, 662 (1980)).  As our appeals court has explained:

> Of course, it is private individuals, not City officials, who have actually interfered with Presley's possessory interests here.  Although private actions generally do not implicate the Fourth Amendment, when a private person acts as an agent of the Government or with the participation or knowledge of any governmental official, then the private person's acts are attributed to the government.  The government need not compel nor even involve itself directly in the private person's actions.

<u>Presley v. City of Charlottesville</u>, 464 F.3d 480, 487 (4th Cir.

2006) (internal citations and quotations omitted).

The undisputed evidence is that Lanham did not acquiesce

in Beck's search of Brodnik's email nor did he know about it

prior to or as it was happening.[6]  In fact, upon finding out

about it, he told her not to do it again.  Beck testified that

she accessed Brodnik's email, not because Lanham told her to, but

because (1) she thought it fell under the scope of the subpoena

she received and (2) she was motivated by a desire to protect

herself.  "One highly pertinent consideration [to whether an

---

[6] Brodnik's attempt to cast Beck as a government agent <u>after</u>
the search of Brodnik's email fails.  The pertinent inquiry is
whether the private actor was a government agent at the time of
the search.  <u>Cf</u>. <u>United States v. Kinney</u>, 953 F.2d 863, 865 (4th
Cir. 1992) (rejecting notion "that even if the search was
originally private in nature, the police, in their subsequent
participation, exceeded the scope of the initial private search,
thereby making their actions unlawful.").  The emails between
Beck and Lanham were all dated after the search of Brodnik's
email occurred.  <u>See</u> ECF Nos. 107-1, 107-2, and 107-3.  Such
evidence is insufficient to show that Lanham knew of and
acquiesced in Beck's email search.  <u>See</u> <u>United States v. Jarrett</u>,
338 F.3d 339, 346 (4th Cir. 2003) ("Although, as the Government
conceded at oral argument, the [ ] email exchange probably does
constitute the sort of active Government participation sufficient
to create an agency relationship going forward (absent other
countervailing facts), the district court erred in relying on
this exchange to find that the Government knew of and acquiesced
in the Jarrett search.  This is so because Unknownuser's email
exchange with Faulkner took place <u>after</u> Unknownuser had hacked
into Jarrett's computer, <u>after</u> the fruits of Unknownuser's
hacking had been made available to the FBI. . . .  Thus,
Faulkner's knowledge and acquiescence was entirely post-search.
Such after-the-fact conduct cannot serve to transform the prior
relationship between Unknownuser and the Government into an
agency relationship with respect to the search of Jarrett's
computer.") (emphasis in original).

agency relationship exists] is `whether the government knew of
and acquiesced in the intrusive conduct and whether the private
party's purpose for conducting the search was to assist law
enforcement efforts or to further her own ends." United States
v. Ellyson, 326 F.3d 522, 527 (4th Cir. 2003) (quoting United
States v. Feffer, 831 F.2d 734, 739 (7th Cir. 1987)).
Furthermore, "[p]re-search contact between a government official
and a private citizen, whether or not intended by the official to
prompt the citizen to render some type of assistance, does not,
by itself, turn a private party into an agent of the government."
Mutual Med. Plans, Inc. v. County of Peoria, 309 F. Supp. 2d
1067, 1076 (C.D. Ill. 2004).

    "In order to run afoul of the Fourth Amendment,
therefore, the Government must do more than passively accept or
acquiesce in a private party's search efforts.  Rather, there
must be some degree of participation in the private search."
United States v. Jarrett, 338 F.3d 339, 344 (4th Cir. 2003).  As
the court explained:

        Viewed in the aggregate, then, three major
        lessons emerge from the case law.  First, courts
        should look to the facts and circumstances of each
        case in determining when a private search is in
        fact a Government search.  Second, before a court
        will deem a private search a Government search, a
        defendant must demonstrate that the Government
        knew of and acquiesced in the private search and
        that the private individual intended to assist law
        enforcement authorities.  Finally, simple
        acquiescence by the Government does not suffice to
        transform a private search into a Government

24

> search.  Rather, there must be some evidence of
> Government participation in or affirmative
> encouragement of the private search before a court
> will hold it unconstitutional.  Passive acceptance
> by the government is not enough.

Id. at 345-46.  In this case, not only is there a lack of

government participation or encouragement, there is also vehement

government opposition to the search as evidenced by Lanham's

directive to Beck not to access Brodnik's email in the future.

Furthermore, to the extent that plaintiff makes much of

the fact that Lanham kept the printout obtained from Beck's

search of Brodnik's email, it does not alter the court's

analysis.  "[E]vidence secured by private searches, even if

illegal, need not be excluded from a criminal trial."  United

States v. Ellyson, 326 F.3d 522, 527 (4th Cir. 2003); see also

United States v. Wolfson, 160 F. App'x 95, 97-98 (2d Cir. 2005)

("[T]he subsequent seizure of the boxes was quite clearly carried

out without the government's knowledge or encouragement, and

hence, does not implicate the Fourth Amendment."); United States

v. Kinney, 953 F.2d 863, 865 (4th Cir. 1992) ("The Fourth

Amendment is directed exclusively at state action and evidence

secured by private searches, even if illegal, need not be exluded

from a criminal trial.").

Likewise, plaintiff's argument that Beck's possible

status as a government informant is of no legal moment.  It seems

clear that Beck was a confidential informant for the government.

<u>See</u> Lanham Depo. at 102-03.  Lanham conceded as much.  <u>See</u> <u>id.</u>
However, the allegations in the complaint – that Lanham
financially incentivized Beck to access Brodnik's email – are not
borne out by the record because there is no evidence that Beck
was a paid government informant.  <u>See</u> Lanham Depo. at 30-31, 102;
Beck Depo. at 14-15.  Furthermore, there is no hard and fast rule
that the actions of a government informant, paid or otherwise,
always rise to the level of government action.  <u>See</u> <u>Hiser v. City</u>
<u>of Bowling Green</u>, 42 F.3d 382, 383 (6th Cir. 1994) (acknowledging
that the court has "refused to establish a per se rule that the
activities of paid government informants must always be
considered government action.") (internal quotation and citation
omitted); <u>Ghandi v. Police Dept. of City of Detroit</u>, 823 F.2d
959, 963 (6th Cir. 1987) ("[W]e reject plaintiffs' invitation to
establish a per se rule that the activities of paid government
informants must always be considered government action.").  In
any event, informant or not, Lanham could not have been clearer
that Beck was not to access Brodnik's email.

> Q:   Okay.  But I want to get back to something
>      you said, which was, if she – if she was
>      an informant, she would not have been
>      permitted to access the e-mail.  And –
>
> A:   That is irrelevant.
>
> Q:   It's not irrelevant.  I can have her read
>      it back, or we'll stand on what you said
>      earlier.
>
> A:   If I said that –

Q:      All right.

A:      – fine.

Q:      All right.

A:      But what I'm trying to tell you is: It
        doesn't matter if she's an informant, if
        she is the president of the United States,
        an attorney or whatever else.  I would
        have instructed her "Do not access his e-
        mail."

        Because I could not do that, and since she
        had talked to me, I knew that we would be
        right where we're at now with an attorney
        trying to say that she was my agent –

Q:      Well –

A:      – and she was not.  And she did not act at
        my direction to access that e-mail.

                        * * *

A:      We're speaking two different languages
        here.  You're speaking what that says.
        She is termed a confidential informant to
        try to protect her identity.  The word
        "informant" that you're hung up on is –
        it's a technical term for federal law
        enforcement and all law enforcement, is a
        person who has been taken in and is –
        records are kept, payments are made to
        them, etc., etc., etc.

Q:      But –

A:      That's what you're getting hung up on.
        And it doesn't matter – it doesn't matter
        what she was, as I've said.  I would have
        told her, "Don't access the e-mail."

Lanham Depo. at 100-03.

        As the Fourth Circuit has noted, there must be "clear

indices of [Lanham's] encouragement, endorsement, and

27

participation . . . to implicate the Fourth Amendment." <u>Presley</u>
<u>v. City of Charlottesville</u>, 464 F.3d 480, 488 (4th Cir. 2006).
The uncontroverted evidence in this case is that Lanham neither
encouraged, endorsed, or participated in Beck's search of
Brodnik's email.  For these reasons, Lanham's motion for summary
judgment is granted.

### III.  Conclusion

For the reasons expressed above:

1)      Plaintiff's Motion For Court to Make Finding As to
        Whether or Not Defendant Deborah Beck is a State
        Actor for Purposes of Bivens Liability (construed
        as a motion for partial summary judgment in
        plaintiff's favor) is **DENIED**;

2)      Lanham's Motion for Summary Judgment as to Count I
        is **GRANTED**; and

3)      Pursuant to concerns regarding HIPAA and
        confidential medical information, ECF Nos. 103-1
        and 103-2 are to be filed under **SEAL**.

The Clerk is directed to send a copy of this Memorandum
Opinion and Order to counsel of record.

**IT IS SO ORDERED** this 30th day of March, 2018.

ENTER:

David A. Faber
Senior United States District Judge